[File No. 6965]

IN THE MATTER OF THE APPLICATION OF JOHN O. HANSON, McCLUSKY, NORTH DAKOTA, for a Special Certificate Authorizing Motor Freight Service in McClusky and Vicinity in Truckload and Less-than-Truckload Lots.

(21 NW2d 341)

Opinion filed August 8, 1945. On rehearing January 9, 1946

*Conmy & Conmy,* for appellant.

*Peter Winter,* for respondent Hanson. *C. F. Kelsch,* for respondent Public Service Commission.

BURR, J. Prior to December 1943, John O. Hanson of McClusky was the holder of an "agricultural carrier" license and had the right to transport

"for compensation, grain, seed, feed, poultry, livestock, dairy products, and other agricultural products, or farm supplies from the farm where such products are produced, grown, or further processed, to the market, village, or place where such products or supplies are sold, stored, disposed of, purchased or acquired, and the hauling or transporting of such agricultural products or farm supplies from the market, village, or place where the same are purchased or acquired to the farm where the same are to be used, consumed, or further processed." § 49-1801, subd 4, Rev Code.

On December 29, 1943, Hanson applied to the public service commission for a certificate of public convenience and necessity and permit to become "a special common motor carrier," to transport goods hereinafter mentioned.

Under the provisions of § 49-1810 Rev Code,

"Special common motor carriers may transport commodities within their authority in any quantity but only from or to that territory or zone for which they heretofore have proved or

hereafter may prove, public convenience and necessity or such territory or zone as may be found by the commission to be convenient and necessary to the public or in the public interest. A special common motor carrier shall be subject to the following restrictions:

1. Such carrier shall not transport shipments in lots less than truckloads, as defined and under the conditions and rules set by the commission, between two or more points served by class A carriers, whether within or without such zone, except under express authority of the commission, to be granted in cases of undue circuity via two or more connecting class 'A' carriers;

2. Such carrier may transport household goods, emigrant movables, or other special commodities or general commodities in truckloads as defined by the commission, from or to points not in such zone or between points on class A routes, by the authority and under the conditions and rules set by the commission;

3. Such carrier, with the approval of the commission and under the conditions and rules set by the commission by tariff publication, may specify minimum shipments which such carrier shall be obliged to carry."

The commission made six findings, No. 2 being as follows:

"That the applicant seeks authority to transport in truckload and less-than-truckload lots to, within and from McClusky and the vicinity thereof:

(a) Grain, coal, brick, tile, sand, gravel and stone;

(b) Livestock to and from the farms and sale rings;

(c) Farm machinery, heavy hardware and automobile parts;

(d) Lumber, grain bins and culverts;

(e) Poultry, poultry products and feeds; and

(f) Household goods, furniture and emigrant movables."

The commission found further:

"That the applicant has established that an actual public need exists and that the public convenience will be served by the transportation of all of the above-named commodities in truck-

load and less-than-truckload lots in the territory described as follows:

All of Sheridan County lying west of Highway No. 14, including all towns and points located within and on the boundary line of said territory, excepting the towns of Lincoln Valley, Denhoff, and Mercer."

The commission further found that the transportational facilities existing within the above-described territory are not reasonably adequate to serve the public needs thereof and "that the proposed motor freight service will not substantially duplicate or substitute motor freight service in lieu of other existing transportational facilities;" nor will it "substantially increase the cost of maintaining the public highways which the applicant will use."

The commission ordered:

"That a Special certificate be issued to the applicant, John O. Hanson, of McClusky, North Dakota, authorizing him to furnish motor freight service in truckload and less-than-truckload lots to, within and from the territory described herein for the transportation of:

  (a) Grain, coal, brick, tile, sand, gravel and stone;

  (b) Livestock to and from the farms and sales rings;

  (c) Farm machinery, heavy hardware and automobile parts;

  (d) Lumber, grain bins and culverts;

  (e) Poultry, poultry products and feeds; and

  (f) Household goods, furniture and emigrant movables."

This appeal is from the judgment entered in the district court upon appeal by the railway company from the decision of the commission and the appellant "demands a review of the entire case in the Supreme Court upon its merits, . . ."

On the appeal from the decision of the public service commission, the appellant sets forth seven specifications of error as follows:

## I.

"Findings of Facts Nos. III and IV and the general conclusion and order are erroneous, in that there is no sufficient proof

in the record showing public convenience and necessity for the hauling of all or any of the various commodities in less than truckload lots in the territory included.

## II.

The Public Service Commission erred in that the Order appealed from allows, permits and provides for a substantial duplication of service by the motor carrier concerned of existing transportation service now furnished by a railroad carrier, contrary to the provisions of § 6, c 164, Sess Laws of 1933, as amended by Chapter 182, Sess Laws of 1935.

## III.

The Public Service Commission erred in that the order appealed from substantially substitutes the facilities and operation of a motor common carrier for existing steam facilities and operations, contrary to the provisions of § 6, chapter 164, Sess Laws of 1933, as amended by chapter 182 of the Session Laws of 1935 (?).

## IV.

The Public Service Commission erred in that it made no sufficient finding and conclusion that public convenience and necessity required the operation here ordered, granted and allowed.

## V.

The Public Service Commission erred in that the Findings of Fact and Conclusions of Law are insufficient to support the Order appealed from, in that there is no Finding that the service furnished or that could be furnished by the existing transportation facilities are not adequate.

## VI.

The Public Service Commission erred in that the Order provides for and allows a carrier operation which is not shown to be a public convenience and necessity, contrary to the provisions of the law thereunto applicable.

## VII.

The Public Service Commission erred in that its Order per-

mits transporting from any point in the state to the certain territory or zone described in the Order and there is no sufficient proof of public convenience and necessity for transporting from any and every point in the state."

The Findings Nos. III and IV to which reference is made deal with the territory allotted to the applicant (III) and the statement "that the motor freight service now furnished by the transportational facilities existing within the above-described territory is not reasonably adequate to serve the public needs thereof."

It will be noted the specifications of error deal largely with the assertion there is not sufficient evidence to sustain the finding and conclusion that public convenience and necessity required the issuance of the permit granted.

The commission is required to take into consideration the existing travel upon the highways, the increased cost, if any, in maintaining the highway; the convenience and necessity of the public as distinguished from that of an individual. Tri-City Motor Transp. Co. v. Great Northern R. Co. 67 ND 119, 270 NW 100. If public convenience and necessity be shown the commission must consider also whether the facilities already existing or which could be furnished by the railroad are reasonably adequate for the needs and the demands of the territory. Theel v. Great Northern R. Co. 72 ND 280, 6 NW2d 560.

The primary jurisdiction to determine administrative questions of the character involved is with the commission and if the preponderance of the evidence supports the findings of the commission, courts do not substitute their judgment for that of the commission. Theel v. Great Northern R. Co. (ND) supra.

McClusky is situated on the branch line of the appellant which runs from Turtle Lake on the west to Carrington on the east where it connects with appellant's branch line from Leeds to Jamestown. At Jamestown it connects with the main line of the appellant's road. There is no other railway at McClusky. The territory described is very limited. It comprises but fifteen townships and six fractions of townships—approximately three more townships—from which are excluded the village of Den-

hoff on appellant's line and the inland town of Lincoln Valley. The town of Mercer is slightly west of the Sheridan county west line and therefore is not included in Sheridan County.

There was evidence presented to the commission tending to show that the residents of the territory described in the certificate granted the applicant required the service which would be rendered, and though service in the main could be furnished by the appellant, nevertheless, owing to the manner and form and place in which the appellant was required by the condition of its business to handle the goods described in the findings of the commission the service rendered by appellant, or that could be rendered by appellant, was so inadequate as to justify the finding and conclusion that public convenience and necessity required such permit to be issued; and further that the service for the community described in the certificate was not a duplication of any existing service.

There is ample evidence showing necessity for the dealers in McClusky to have the advantage of such service. Machinery and hardware dealers in McClusky testified in this respect. John J. Dahl, a dealer in farm implements with his business established in McClusky, showed that shipment of goods which he ordered would come in pool cars to Goodrich and other points, to be divided there, and shipped by freight to him at McClusky so that in small part loads this breaking up took extra time, caused extra expense and required extra handling. He testified that if this service was granted he could have a tractor or truck which was ordered for a customer delivered to the applicant at Goodrich and sent direct to the customer instead of having it shipped on to McClusky and handled there for delivery. When asked in regard to the nature of his business, he showed that such service was of value in emergency periods when time was important and he said, "when we cannot haul from dealer to dealer we are absolutely handicapped in that respect." He testified that such service would be of great convenience in these rush periods when they would have more occasion to use the truck service. When asked by counsel for the appellant "in other words it is a convenience but probably

not a necessity," he answered, "Yes, it is a necessity." There were other businessmen in McClusky dealing in farm implements, automobiles and what are known as "parts." The gist of their testimony is this—there was not only convenience in having a licensed applicant who could deliver those commodities to their customers but that at certain times of the year there was a necessity for it, particularly in the rush season when under the very nature of the circumstances the railroad, even in furnishing as prompt service as it was able to furnish, subjected the dealer to at least twenty-four hours delay.

Much is said about testimony in regard to the zone from which these commodities were to be hauled with special reference to securing the commodities shipped to Harvey and Fessenden in pool cars. This testimony, however, was not limited to Harvey and Fessenden. These towns were used as illustrations. There was testimony showing required service from Fargo, Carrington, Mercer, Bismarck and other points. One witness told of the difficulty in getting combines and tractors from Bismarck except by the round-about method of the railroad service. The pool car was divided at Bismarck and the witness testified it was necessary to immediately get these commodities out of the car, saying, "of course, the farmers are demanding them. There was a big demand and that is why I have to get them."

Stress is laid on the fact that this applicant was already the possessor of an agricultural permit and that the commodities specified in the permit which he is permitted to transport could in the main be transported already for the people of that zone under the agricultural permit. Appellant says: "We have a situation here where the commission has given authority to Hanson to haul all or any of the commodities listed under 'a' to 'f' in the certificate from McClusky zone to anywhere and from anywhere to the McClusky zone. Resolving every doubt in favor of the commission's findings, the only proof in this record as to public necessity is 1st: For hauling of farm machinery from Harvey and Fessenden to McClusky; 2nd: For the hauling of automobile parts from Fargo and possibly Mercer to McClusky; 3rd: For the hauling of heavy hardware from Mer-

cer to McClusky; 4th: For the hauling of household goods from McClusky generally. The commodities listed under A, B, D and E are supported by no proof of public necessity at all, as the farmers who testified with reference to these commodities could have them hauled by Hanson at all times under his agricultural permit."

Clearly the applicant was desiring to have a permit somewhat broader in authority than his agricultural permit and so he made application for the right of transporting the goods described in (c) and (f) heretofore set forth.

With reference to the commodities listed under A, B, D and E, appellant argues there is not proof to show "public necessity" in that the applicant already had an agricultural permit and, therefore, under this agricultural permit may haul these commodities now. If the applicant could do this already then this permit which he seeks and which was granted to him does not in any way affect the applicant. Their inclusion in the new permit sought would indicate that this new permit was merely an enlargement of the old, but under somewhat different conditions as to persons and places. With reference to commodities in class (c) and (f) appellant concedes that if doubts are to be resolved in favor of the findings of the commission there is proof furnished.

In the very nature of the case "public convenience and necessity" is a term hard to define. As said in Salt Lake & Utah R. Corp. v. Public Serv. Commission, 106 Utah 403, 149 P2d 647, "it is the public good and convenience which is the yardstick to be used in determining advisability of granting or denying a certificate of necessity and convenience to a common motor carrier." The fact that the Utah statute provides "the findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review . . . (76-6-16 UCA 1943)" does not alter the scope of the rule laid down. In this case cited the railway company had stated it should have been given further opportunity to furnish required service before allowing a competing motor carrier to enter the field; but the court held that the policy governing the public service commis-

sion was a matter to be determined largely by the commission within the provisions of the statute and as to the policy of issuing a license to a competing motor carrier the public service commission could take notice that "there was no evidence that additional competition would so impair revenues of the existing carrier as to impair its ability to serve the public." Quoting from its own decision in Union P. R. Co. v. Public Serv. Commission, 103 Utah 459, 135 P2d 915, the court said "an adequate rail service may not and cannot always afford an adequate general transportation service." Where an administrative agency must determine what is "public convenience and necessity" a certain amount of judgment and discretion must be allowed the commission. The commission is intrusted with the duty of determining these things and its order cannot be said to be arbitrary, capricious or unreasonable when there is substantial evidence from which to draw reasonably the inference of the existence of the facts necessary to support the claim of public convenience and necessity.

This permit, if granted, would provide a responsible and bonded individual on call to do the work required. We are satisfied there was sufficient evidence to sustain the findings of the trial court who reviewed and heard the appeal from the public service commission even to the extent insisted by the appellant in the cited cases of Stork Restaurant v. Boland, 282 NY 256, 26 NE2d 247; Johnson v. Allispaugh, 58 Ind App 83, 107 NE 686; and National Labor Relations Bd. v. Columbian Enameling & Stamping Co. 306 US 292, 83 L ed 660, 59 S Ct 501. Here these courts hold that for a finding to be "supported by the evidence" there must be evidence so substantial that from it an inference of existence of facts found may be drawn reasonably. The New York decision in construing the expression "supported by the evidence" states "a mere scintilla of evidence sufficient to justify suspicion is not sufficient to support a finding upon which legal rights and obligations are based."

The hearing in this case was held in conjunction with the hearing in the companion case wherein Fred L. Adams sought a similar permit for an adjoining district. In the Adams hearing

the representative of the commission set forth the construction of the statute which the commission has followed and this construction is adopted by the commission on this argument. In referring to powers granted under such permit it was stated,

"you can haul from anywhere in the State to this prescribed territory you want, if it is granted. You can haul from out of that territory to anywhere in the State."

Appellant contends that this is an unwarranted construction of the statute; that if the permit be granted so that the applicant could haul to points outside of the territory or zone the places to which he may carry must be specified and his service would be limited to such places and if he, in serving the zone, were to bring to them commodities from outside of the zone the places from where that freight may be hauled must be stated definitely; that there is no evidence presented to permit indiscriminate service to or from places outside of the territory and therefore, if the commission were justified in granting a permit at all, the permit should be limited to those places described in the evidence.

When we examine the statute involved, § 49–1810, Rev Code, we notice that the special common carriers may transport commodities *"from or to that territory or zone for* which they heretofore have proved public convenience and necessity. . . ." The purpose of the statute is to serve a certain territory or zone. The statute does not limit service to places within the zone.

The development of this commission control is of value here. Chapter 164, § 8, Sess Laws 1933, provides that a common motor carrier may have a certificate "to operate in the territory proposed to be served by the applicant" and in § 10 of the same statute it is required that applicant must describe the "territory to be served." The place "from or to the zone" is not used. This Statute (c 164, Sess Laws 1933) is not an amendment of any preceding statute but from its terms is an entire and complete statute regulating motor vehicle transportation. This c 164, Sess Laws 1933, was amended by c 197, Sess Laws 1941, so as to provide that: " 'special' common motor carriers may

transport commodities within their territory in any quantity or quantities but only from or to that territory or zone for which they have heretofore proved, . . . public convenience and necessity, or such territory or zone as may be found by the Commission to be convenient or necessary to the public or in the public interest; provided, that no 'special' motor carrier shall transport shipments in lots less-than-truckloads, as defined, and under the conditions and rules set, by the Commission, between two or more points served by class 'A' carriers whether within or without such zone, except under express authority of the Commission to be granted in cases of undue circuity, via two or more connecting class 'A' carriers; and, provided further, that 'special' motor carriers may transport household goods, emigrant movables, or other special commodities, or general commodities in truckloads . . . from or to points not in such zone. . . ."

The carrier has commodities in the zone, he may transport these to places outside of the zone. He has commodities which he brought into the zone and may transport these to any place within the zone.

It will be noticed that this language is broader than the language used in c 164, Sess Laws 1933. In the earlier statute the applicant was required to "operate" in the territory he proposed to serve, whereas in the latter section the special common carrier operating in a zone may transport commodities from or to the zone which he proves requires the service.

This is the language used in § 49–1810, Rev Code, 1943. This latter statute does not put any limit or boundary upon the places from which the common motor carrier may transport commodities to the zone, nor upon the places to which he may transport commodities from the zone. Instead of the public transporting commodities to any place desired, outside of the zone, or going outside of the zone for commodities, desired to bring to the zone, it may employ this special motor carrier. The statute provides that he be a responsible carrier—financially responsible, and one who will operate motor vehicles carefully and safely.

With reference to the goods described in (f) ". . . household goods, furniture and emigrant movables" it will be noticed that under the provisions of subd 2, § 49–1810, the special carrier, if granted a permit so to do, "May transport household goods, emigrant movables, or other special commodities, or general commodities in truckloads as defined by the commission from or to points not in such zone or between points on Class A routes, by the authority and under the conditions and rules set by the commission; . . ."

It is argued this clearly shows it was only with regard to this class of commodities the special carrier may go outside of his zone with commodities or to get commodities.

Under § 49–1810, Rev Code, the special common carrier is permitted to serve the public by transporting goods to or from that zone. He may not transport less-than-truckloads between two or more points served by class "A" carriers whether within or without the zone except that he may transport the household goods, emigrant movables or other special commodities defined by the commission from or to such points not in such zone as may be required. The special carrier may transport goods from any place outside of the zone provided the goods are to be delivered within the zone or to any place outside of the zone, provided the cargo originates within the zone. If these various points are served by class "A" carriers the special carrier shall not transport shipments in less-than-truckload lots unless given express authority by the commission so to do in case where it is necessary because of undue circuity.

The commission found public necessity for the extra powers granted to the applicant, even though the demand may be slight in quantity and value. The commission had a right to consider the character of the permit already possessed by the applicant.

It is claimed by the appellant that applicant might not be available to the people for service at all times, and therefore, public convenience would suffer; but it must be remembered that if his services rendered under the provisions of this permit are not satisfactory the permit may be cancelled. The primary

duty of the applicant is to the public. For this reason his bond is given and he is under the supervision of the commission.

Such service desired differs radically from service that parallels the line of the appellant. On parallel-line service the saving of a few cents or a few minutes of time may, in the judgment of the commission, determine that public demand and necessity do not require it; but where people living within a well-defined district must sell to and receive from points north or south of the territory served by this branch line, it becomes important to determine whether the public demand and the public necessity is such that these people should have the service required.

It is true that at times territory to be so serviced may be so limited as to justify refusal to grant such permit. Where such twilight zone exists, is in the first instance to be determined by the commission. We are satisfied the findings and conclusions of the commission are sustained by the evidence, and so the judgment of the lower court is affirmed.

CHRISTIANSON, Ch. J., and MORRIS, BURKE and NUESSLE, JJ., concur.

BURR, J. On rehearing. We granted a rehearing to consider more fully two propositions urged by appellant with great earnestness. In general the first is: The court overlooked and misconstrued the statutes involved in their application to the principle that no public motor transportation license should be granted in a case where the territory to be served by this special license is served already by adequate transportational facilities which, if necessary, could and would be improved on the order of the public service commission.

The second is: the permit granted is too broad in that it permits competing service parallel to adequate service already in operation.

The first proposition concerns the zone. The zone created includes the city of McClusky. It is claimed there is no evidence of public convenience and necessity for this zone except such as

might inure solely to the benefit of residents of McClusky; that without this there is no need of granting the permit for this zone as the licensee has ample authority under the agricultural permit already granted to him, and McClusky has adequate transportational service today.

The creation of a zone is a matter primarily within the jurisdiction of the public service commission. The fact that a city within that zone is situated upon a railroad does not prevent the commission from determining there is a public necessity and convenience demand for the whole zone. That the city has ample transportation services furnished by the railroad, or which could be furnished by the railroad, does not prevent the commission from considering public necessity and convenience for commodities demanded by the residents of the city and for which the railroad services are not adequate. The evidence to show public necessity and convenience for the entire zone may be obtained from any source available. In prescribing the powers and privileges of the applicant the commission must, perforce, take into consideration the transportation services available from the railroad company, whether it be for the city or for the remainder of the zone. The commission cannot be required to eliminate the town. Its view of the entire situation must be governed broadly. Where there are existing parallel lines of service adequate in their nature these must be considered favorably. See Tri-City Motor Transp. Co. v. Great Northern R. Co. 67 ND 119, 270 NW 100.

The function of the commission is to oversee and provide for adequate transportation services if available. The permit should not be granted simply to permit the applicant to make a living at the expense of established systems.

It appears that during the last few years, owing to the great emergency caused by the war, the traffic demand upon railroad facilities and equipment was so great the service rendered was affected to some extent. The commission had the right to take this into consideration even though it might consider the emergency as temporary. The public should not suffer even if the situation created conditions over which the railroad had little if

any control, if these profoundly affected public necessity and convenience, and could be remedied by the commission. The privilege which the commission gives the applicant it may take away when the emergency passes, if it does.

In addition the commission is not confined to the immediate present. It must have a broad view and a far look and though public necessity and convenience may seem to be somewhat trivial at first, to the commission charged with the duty of oversight it may appear conditions were so shaping themselves there is a growing demand now and for the immediate future and thus the commission be required to make provision therefor. It is not merely the necessity for the next day; but for the morrow which governs the commission.

If the condition be an emergent one, because of the war, and of such a character that the commission deems it necessary to grant the permit the commission has also the power to discontinue it if the emergency disappears and there is no longer public necessity.

The second point deals with the power granted by the permit in relation to the transportational services already in existence. In the main opinion we called attention to the finding of the commission relative to the existing railroad facilities, and also to our decisions with reference to the necessity for the commission taking such into consideration. Theel v. Great Northern R. Co. 72 ND 280, 6 NW2d 560. In the main opinion we referred to the fact that the commission found, "That the motor freight service now furnished by the transportational facilities existing within the above-described territory is not reasonably adequate to serve the public needs thereof." Strictly speaking this finding is limited to the "transportational facilities" furnished by "motor freight service." Appellant urges that the permit granted is too broad in its scope; that under the provisions thereof the licensee was permitted, or at least not forbidden, to parallel its lines and transport freight to and from Mc-Clusky to all points along the railroad line on which McClusky is situated and to or from any distance—in effect giving him permission to transport freight which ordinarily would be

transported by the railroad company, and thus become an established competitor; and that there was no showing whatever that such competition was justifiable or necessary.

The main complaint of the appellant in this respect is that the permit is too broad and that the decision of the court did not take care of this feature. There is merit in this complaint. Section 49–1814, Rev Code provides:

"Before granting a certificate to a common motor carrier, the commission shall take into consideration:

1. Existing travel upon the route of the carrier;
2. The increased cost of maintaining the highway concerned;
3. The effect on other essential forms of transportation; and
4. Existing transportation facilities in the territory for which a certificate is sought.

In case it appears from the evidence that the service furnished or that could be furnished by existing transportation facilities is reasonably adequate, the commission shall not grant such certificate."

It is not the purpose of the statute to permit the establishment of an additional transportational service in a case where the existing service is adequate. The record shows that the appellant furnishes six days per week railroad service to McClusky from points east and west; that the branch line on which McClusky is situated connects with another branch line at Carrington and from there connects with the main line at Jamestown. No witness testified that this service was not continuous six days in the week. It is apparent that the railroad furnishes adequate transportational services from and to McClusky from all towns along these lines. The evidence dealt largely with what might be called cross-country service and while this cross-country service may not be very extensive, nevertheless, the commission found and justifiably so, that such service was necessary from the standpoint of public necessity and convenience. However, there is nothing in the record to show that additional transportational service is necessary paralleling the railroad. Testimony showing sporadic instances is not enough.

The complaint of the appellant is set forth in its Specifications

of Error II and III. The record of the hearing shows that, to a large extent at least, the evidence furnished by the applicant was directed to cross-country service and it is clear this was the subject under consideration by the commission. Under the permit granted the applicant would have the right to transport the commodities described to McClusky from all towns along the branch line and from McClusky to these towns. Thus the applicant could parallel railroad service from Turtle Lake the western terminus of the branch and from all points along that line to and from Jamestown and other points on the main line. We take judicial notice of the fact that the appellant has service lines of branch lines of road running from the main branch from Jamestown to Leeds and that also the territory north of McClusky is serviced by the main line of the Soo railroad running in a northeasterly and northwesterly direction. Between those roads there are considerable cross-country settlements, and shipments to the zone from these various places via railroad service require long and circuitous routes. The commission found public necessity and convenience for this cross-country service existed and we are convinced it was not the purpose of the commission to permit duplication of or competition with the railroad along the railroad line from McClusky, easterly to Carrington, Jamestown, Fargo, etc. However the permit granted made no such limitation. There is no testimony to show necessity for such duplication nor is there any proof adduced to show that if the railroad service now existing is not adequate it could not and would not be remedied by the appellant, and particularly after the emergency would cease.

We adhere to the view that the commission was justified in granting the permit sought. The commission is the body charged by law with the determination of such issues. Where service is now rendered and a newcomer seeks entry into the field he must show the public requires the services sought to be furnished. This quotation from a recent opinion of the United States Supreme Court is pertinent:

"The Commission is the guardian of the public interest in de-

termining whether certificates of convenience and necessity shall be granted. For the performance of that function the Commission has been entrusted with a wide range of discretionary authority. Interstate Commerce Commission v. Parker, 326 US 60, 89 L ed 2051, 65 S Ct 1490. Its function is not only to appraise the facts and to draw inferences from them but also to bring to bear upon the problem an expert judgment and to determine from its analysis of the total situation on which side of the controversy the public interest lies."

United States v. Detroit & C. Nav. Co. decided November 5, 1945. 326 US 236, 90 L ed (Adv 12) 66 S Ct 75.

The commission is directed to modify the certificate and license granted so as to exclude duplicate service along the lines of the appellant as indicated. With this modification we adhere to the decision already rendered and affirm the judgment.

CHRISTIANSON, Ch. J., and NUESSLE and BURKE, JJ., concur.

MORRIS, J. (dissenting). I adhere to the original opinion and dissent from what is said in modification thereof on rehearing.